IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| ANNIE LOIS FLOWERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:04CV424-SRW |
| | ) | |
| JO ANNE B. BARNHART, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF OPINION**

Plaintiff Annie Lois Flowers brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income and disability insurance benefits under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be reversed.

**BACKGROUND**

On January 28, 2002, plaintiff filed an application for disability insurance benefits and Supplemental Security Income. On March 12, 2003, after the claim was denied at the initial administrative levels, an ALJ conducted an administrative hearing. The ALJ rendered a decision on April 11, 2003, in which he found that the plaintiff has severe impairments of hypertension, asthma, hypothyroid and headaches and cannot perform her past relevant work.

However, he concluded that she is not disabled because she retains the residual functional capacity to perform a significant range of light work and there are a significant number of jobs in the national economy that she could perform. On February 25, 2004, the Appeals Council denied plaintiff's request for review and, accordingly, the decision of the ALJ became the final decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

The plaintiff challenges the Commissioner's decision, arguing that: (1) the ALJ failed

to consider the side effects of plaintiff's medication, her frequent visits to the doctor and her need to use a breathing machine, which render her unable to work on a regular and continuing basis; and (2) the ALJ failed to consider the severity of plaintiff's malignant hypertension when evaluating her residual functional capacity.

In determining a claimant's residual functional capacity, the ALJ is required to consider all of the relevant evidence of record, such as "[t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (*e.g.*, frequency of treatment, duration, disruption to routine, side effects of medication) . . . ."  SSR 96-8p.  In this case, plaintiff testified that she is required to see Dr. Sy, her treating physician, for follow-up of her high blood pressure at varying intervals – sometimes "once a week," sometimes "every two weeks," and sometimes "once a month."  (R. 42-43).  The medical record demonstrates that plaintiff received treatment from Dr. Sy, Dr. Charlton, or at Dale Medical Center on twenty-one days in 2003 (R. 136-49, 212-23, 258, 267-74, 284-87, 292-96) and eleven days in 2003 prior to the hearing before the administrative law judge on March 12, 2003 (R. 229, 261-63, 275-77, 280-83, 290-91, 297, 300-04).  Plaintiff's attorney argued in a letter to the ALJ that her client was disabled due, in part, to the necessity for frequent follow-up for control of her severe malignant hypertension.  (R. 200-01).

The ALJ rendered a step five decision in this case.  In assessing the plaintiff's RFC, the ALJ stated, "The record shows persistent elevated blood pressure, however, the record shows repeatedly that hypertension was poorly controlled secondary to the claimant's non-compliance with medication.  She continued to use money to buy cigarettes and she smokes

against medical advice." (R. 17). The ALJ did not include any reference to a need for absences from work for follow-up appointments in plaintiff's RFC. (R. 17). At the hearing, the vocational expert testified regarding the significant number of jobs available for a person with plaintiff's RFC, as determined by the ALJ. (R. 45). Then, he testified as follows:

> Q. . . . If the person was limited to light work, but would have frequent absences from work, would be unable to sustain an eight-hour day or a 40-hour work week on a sustained basis, would I be correct, there would be no jobs the person could perform?
>
> A. Yes, sir . . . .

(Id.).

Plaintiff testified at the hearing that she had stopped taking her medication once in 2001 because she did not have the money to purchase it. (R. 31). The medical record contains evidence that plaintiff was also noncompliant as to her medications at various times in 2002. In June, 2002, Dr. Sy noted:

> This is a 42 year old black female who suffers from bronchial asthma and hypertension. She is here for follow-up. She has not bought any of her medications. She is out of most of her antihypertensive medications. We have called in a prescription, but she has not picked it up.

(R. 213). Dr. Sy's treatment notes for July 19, 2002 state:

> Blood pressure is poorly controlled due to patient's noncompliance. She wants me to give her samples and help her apply through the medication assistance program.

(R. 287).

The record contains other references to plaintiff's inability to afford her medications or treatment. In January 2002, Dr. Sy noted that plaintiff had been discharged from the

4

hospital with a diagnosis of acute exacerbation of COPD with a prescription for Prednisone. Dr. Sy stated, "She did not fill the Prednisone.  She said that she has run out of money." (R. 223).  In August 2002, plaintiff called Dr. Sy's office requesting samples of Toprol, one of her blood pressure medications.  A note in plaintiff's record reads, "Pt stated I already have bill @ ofc + no money to pay." (R. 285).  Plaintiff also requested or received samples of different medications from her physician on January 8, 2002; March 7, 2002; April 8, 2002; April 30, 2002; May 22, 2002; July 9, 2002 and August 26, 2002 (R. 216, 221, 222, 223, 285, 287).

The ALJ's decision does not explicitly address the issue of plaintiff's frequent follow-up appointments.  However, as noted above, he concluded that plaintiff's blood pressure remained out of control due to her non-compliance.  It appears that he further rejected her contention that she could not afford the medication because she "continued to use money to buy cigarettes."  (R. 17).[1]  At the hearing, plaintiff testified as follows:

> Q.  There's some indication that you stopped taking your medication back in 2001.  Did you stop taking it?
>
> A.  Once, because I didn't have the money to buy it with.
>
> Q.  And how much did it cost?
>
> A.  My 90 milligram, they was $90-some a month. And then I was taken some more – I had water pills, and I forgot how much they was, but it was pretty high.

---

[1] Plaintiff's counsel points to several notations in plaintiff's medical records during 2002 which state that plaintiff had quit smoking.  See Plaintiff's reply brief, Doc. # 18, p. 5 n. 2. However, plaintiff testified at the hearing that she still smokes, although less than she did previously. (R. 31-32).  Additionally, treatment records from Dr. Cromer-Tyler in March 2003 and Dr. Charlton in April 2002 both indicate that plaintiff smokes one pack of cigarettes per day.  (R. 258, 302).

>    Q. Okay. Do you still smoke?
>
>    A. Yes, sir.
>
>    Q. How much do you smoke?
>
>    A. Probably about a half a pack a day or more.
>
>    Q. You smoke less now or more now than you did before?
>
>    A. I smoke less now.
>
>    Q. So how much does a pack of cigarettes cost you?
>
>    A. Two dollars and something, the kind I smoke.
>
>    Q. Have you had any income since you left the work as a housekeeper?
>
>    A. No, sir, no more than little unemployment I was getting. It was $101.
>
>    Q. Receive any food stamps?
>
>    A. Yes, sir, I get food stamp.
>
>    Q. No, are you single, married?
>
>    A. Me and my husband's separated.

(R. 31-32). The ALJ further elicited plaintiff's testimony that she owns a Honda CRX, one-third of an acre of property and a mobile home that plaintiff finished paying for a few years before the hearing. (R. 32-33).

The court cannot determine conclusively from the ALJ's decision whether he decided that: (1) the plaintiff would not incur absences from work for medical treatment on a sufficiently "frequent" basis to preclude employment as testified to by the VE; or (2) if she did, it was due to her noncompliance with medications – which is not justified by her poverty

because of her continued expenditures for cigarettes – and, therefore, plaintiff's need for frequent medical follow-up should not be considered in evaluating her RFC. Since the ALJ did not expressly discount plaintiff's asserted need for frequent medical treatment, however, it appears that his decision is based on the latter.

The ALJ's determination of plaintiff's RFC and his resulting conclusion that she is not disabled appear to be significantly based on the ALJ's finding of noncompliance. Under these circumstances, the ALJ was required to determine that the noncompliance was unjustified. Dawkins v. Bowen, 848 F.2d 1211 (11th Cir. 1988). Additionally, "[t]he burden of producing evidence concerning unjustified noncompliance is on the [Commissioner]." Id. at 1214 n. 8. In this case, evidence that the plaintiff "continued to use money to buy cigarettes" does not constitute substantial evidence to support the ALJ's implicit conclusion that plaintiff's noncompliance with her medications was unjustified. The ALJ's conclusion is apparently based on the premise that plaintiff could have chosen to stop smoking and to spend the money on medications instead.

In Seals v. Barnhart, 308 F.Supp.2d 1241 (N.D. Ala. 2004), the court considered the issue of noncompliance with respect to a plaintiff who suffered from chronic obstructive pulmonary disease and who failed to follow her doctor's instructions to stop smoking. The plaintiff's failure to stop smoking was central to the ALJ's determination that plaintiff was not disabled. The court stated:

> Breaking an addiction is not a simple matter of rationally deciding to cease the addictive behavior, whether it be smoking, drinking, or drug abuse. . . . In the case of nicotine addiction, a mere failure to successfully stop smoking will not support a finding of willful refusal to try. If the plaintiff was unable to stop

7

>smoking because she was addicted to nicotine, her noncompliance would not be unjustified. The burden is on the Commissioner to produce evidence of unjustified noncompliance. In the present case, the ALJ made no finding that the plaintiff was actually able, mentally and physically, to stop smoking. Nor did the Commissioner cite to any evidence, other than the plaintiff's failure to stop smoking, to show that her noncompliance was unjustified.

Id. at 1251 (citation omitted). Likewise, in the present case, the ALJ made no finding that the plaintiff was actually able to stop smoking. Thus, the ALJ erred in relying on plaintiff's continued expenditures for cigarettes to support his apparent conclusion that cessation of smoking would have alleviated plaintiff's poverty to the extent that she could have afforded her medications.[2] See also Dawkins, *supra*, 848 F.2d at 1213 ("We agree with every circuit that has considered the issue that poverty excuses noncompliance."); Ellis v. Barnhart, 384 F.Supp.2d 1195, 1203-04 (N.D. Ill. 2005)(ALJ erred by relying on the fact that "plaintiff had money to buy cigarettes" to reject plaintiff's assertion that she did not take her blood pressure medications because she could not afford them; ALJ's determination nevertheless upheld because other evidence made it "less likely" that her noncompliance was due to her poverty); Shramek v. Apfel, 226 F.3d 809, 813 (7th Cir. 2000)("Given the addictive nature of smoking, the failure to quit is as likely attributable to factors unrelated to the effect of smoking on a person's health. One does not need to look far to see persons with emphysema or lung cancer – directly caused by smoking – who continue to smoke, not because they do not suffer gravely from the disease, but because other factors such as the addictive nature of the product impacts their ability to stop. This is an unreliable basis on which to rest a credibility

---

[2] It does not appear from the record that, even if plaintiff were to quit smoking, the "[t]wo dollars and something" per pack she would save would be sufficient to cover the cost of her medications.

8

determination.").

Additionally, Dr. Sy's records reflect that plaintiff was directed to take Albutrol nebulizer treatments as often as four times a day. (R. 212, 213, 215-17, 221-223). When the ALJ questioned plaintiff at the hearing about medication for her breathing, plaintiff responded that she had a pump and also "a machine at home." (R. 34). In his decision, the ALJ acknowledges this testimony (R. 17), but does not discuss the breathing machine treatments in assessing plaintiff's RFC. The court is cognizant of the fact that the ALJ need not discuss every piece of evidence in the record. However, the need to take nebulizer treatments as often as four times a day is certainly a factor that could limit the number of jobs available to the plaintiff. To the extent the ALJ rejected plaintiff's testimony regarding the use of the machine, his decision does not adequately explain his rationale and is not supported by substantial evidence.[3]

## CONCLUSION

For the foregoing reasons, and upon review of the record as a whole, the court concludes that the decision of the Commissioner is due to be reversed and remanded for further proceedings to determine whether: (1) plaintiff's uncontrolled hypertension required or requires medical evaluation at a frequency which would preclude her ability to perform work on a "regular and continuing basis"[4] and, if so, whether plaintiff's noncompliance was

---

[3] While the plaintiff's activities of daily living are, as determined by the ALJ, consistent with an exertional capacity for light work, they are not inconsistent with having to take nebulizer treatments.

[4] See SSR 96-8p ([RFC] is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A "regular

justified by her poverty, without reference to her expenditures for cigarettes, unless the ALJ determines that plaintiff was or is able to stop smoking; and (2) plaintiff's requirement for nebulizer treatments impacts her RFC so as to preclude full-time employment.

A separate judgment will be entered.

DONE, this 8th day of May, 2006.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE

---

and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.").